[relates to Docket Items 54 & 59]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ANDREA PETINGA & GUY PETINGA, | : | HON. JEROME B. SIMANDLE |
| Plaintiffs, | : | Civil No. 05-5166 (JBS/AMD) |
| v. | : | |
| SEARS, ROEBUCK AND CO., | : | **OPINION** |
| Defendant. | : | |

APPEARANCES:

Fredric J. Gross, Esq.
Susan E. Babb, Esq.
FREDRIC J. GROSS LAW FIRM
7 East Kings Highway
Mt. Ephraim, NJ 08059
    Attorneys for Plaintiffs Andrea Petinga and Guy Petinga

Martin L. Sisselman, Esq.
Christine Anne Ruscigno, Esq.
SISSELMAN & SCHWARTZ, LLP
75 Livingston Avenue
Roseland, NJ 07068
    Attorneys for Defendant Sears, Roebuck and Co.

Jonathan R. Westpy, Esq.
LAW OFFICES OF JONATHAN R. WESTPY
100 Eagle Rock Avenue
East Hanover, NJ 07936
    Attorney for Third-Party Defendants Biggs Heating and Air
    Conditioning and Lester Biggs

Joseph G. Murray, Esq.
ZIMMERER, MURRAY & CONYNGHAM, ESQS.
Park 80 West, Plaza One
Saddle Brook, NJ 07663
    Attorney for Third-Party Defendants George Markey and Ocean
    Air Heating & Air Conditioning

**SIMANDLE,** District Judge:

## I.   INTRODUCTION

This diversity action arises out of a seemingly modest home improvement project gone very wrong.  In 2002, Plaintiffs Andrea and Guy Petinga contacted Defendant Sears, Roebuck and Company ("Sears") about purchasing a central air conditioning system for their home in Atlantic City, New Jersey.  A representative from Sears convinced Plaintiffs to replace their heating system in addition to installing a new air conditioning system, and, after the parties entered into a contractual agreement for the purchase and installation, a subcontractor employed by Sears commenced work at the Petinga residence.  The project, which Plaintiffs allege was supposed to take days to complete, stretched on for more than a year, and resulted, according to Plaintiffs, in substantial property damage and a dysfunctional heating and air conditioning system.  The project also led to this lawsuit, which Plaintiffs commenced in October 2005.

Presently before the Court are Defendant's motion for partial summary judgment [Docket Item 54] and Plaintiffs' cross-motion for partial summary judgment [Docket Item 59].  For the reasons explained below, the Court will grant in part and deny in part each of the parties' cross-motions.

## II.   BACKGROUND

### A.   Facts[1]

Plaintiffs Andrea and Guy Petinga own a two-story residence located in Atlantic City, New Jersey.  (A. Petinga Dep. at 7.) The residence is divided into two apartments, and Plaintiffs have historically resided in the downstairs apartment while renting out the upstairs apartment.  (Id. at 8.)  Before the events

---

[1]  As an initial matter, the Court notes that Plaintiffs' Statement of Disputed and Undisputed Facts "presents [Plaintiffs'] version of the facts in a generally unclear and disorganized fashion."  Hancox v. Lockheed Martin Technology Services, No. 04-6104, 2007 WL 1796248, at *1 n.1 (D.N.J. June 21, 2007).  Although the events underlying this lawsuit are not especially complicated and are easily subject to chronological presentation, Plaintiffs' statement of facts jumps from topic to topic in a "haphazard manner," id., with no apparent regard for chronology or reader comprehension.  This disorganized presentation is exacerbated by the failure to focus on "material facts," L. Civ. R. 56.1 (emphasis added), in that Plaintiffs' forty-four page factual summary contains a host of facts which, while potentially relevant to this lawsuit as a whole, are not relevant to the parties' partial summary judgment motions.  See Lite, N.J. Federal Practice Rules, Comment 2.a to L. Civ. R. 56.1 (Gann 2009) ("The purpose of . . . the 'L. Civ. R. 56.1 statement' is to narrow the issues before the District Court, to assist in identifying whether material facts are, or are not, in dispute in a summary judgment motion.").  As this Court has previously noted:

> The Court echoes Judge Wolin's comments in Calwan v. United States, 2000 U.S. Dist. LEXIS 18808, *39 (D.N.J. Dec. 26, 2000), that where the lack of a clear and organized statement of undisputed facts "hampered the process [of reviewing the record and materials submitted], any complaint that some piece of evidence was overlooked, for example in a motion for reconsideration, is correspondingly attenuated."

Hancox, 2007 WL 1796248, at *1 n.1.

3

underlying this dispute took place, the house had no central air conditioning system, although Plaintiffs had installed air conditioning units in various windows of the house.  (Id. at 9.)

In October 2002, Plaintiffs read an advertisement placed by Sears in the Atlantic City Press for the sale and installation of central air conditioning systems, and Mrs. Petinga contacted Sears in order to obtain a proposal for the installation of such a system in the Petinga residence.  (Id. at 9-11; Sisselman Cert. Ex. C at 2-3.)  On October 28, 2002, in response to Mrs. Petinga's inquiry, Sears sent its agent, Rich Vogel, to the Petingas' residence.  (Sisselman Cert. Ex. C at 2.)  Mr. Vogel inspected the property and discussed with the Petingas the possibility of installing an air conditioning system with two separate condenser units – one for the upstairs apartment of the house and one for the downstairs apartment.  (G. Petinga Dep. at 35-36.)

Additionally, during his inspection, Mr. Vogel stated to the Petingas that their existing heating system was "antiquated" and "not efficient" and advised the Petingas that it would be more "economical" to install an upgraded heating system as well while the air conditioning system was being installed.  (Id. at 39.) Mr. Vogel informed Plaintiffs that they would need to purchase a 100,000-BTU gas forced-air furnace in order to heat the house's downstairs unit and an 80,000-BTU gas forced-air furnace in order

4

to heat the upstairs unit.  (Sisselman Cert. Ex. C at 2-3.)
Although Plaintiffs now state that they "had no complaints about
the heat, reliability or cost of operating the original heating
system," (A. Petinga Decl. ¶ 4), they agreed to purchase an
upgraded heating system in addition to the central air
conditioning system.  (G. Petinga Dep. at 40.)

On October 28, 2002, the day of Mr. Vogel's visit to the
Petinga residence, the Petingas entered into a contract with
Sears for the purchase and installation of a new heating and air
conditioning system for the house for $13,316.00.  (Sisselman
Cert. Ex. B at 1.)  While the parties' written contract did not
set forth the start and completion dates for the installation,
according to Plaintiffs' undisputed evidence, the parties orally
agreed that the work would commence on or about January 2, 2003.
(Sisselman Cert. Ex. C at 3-4.)  Mr. Vogel represented to
Plaintiffs that the installation work on the first floor would
take between three and four days to complete, and that the
installation work on the second floor would take between two and
three days to complete.  (Id. at 4.)

Installation work commenced on or around February 25, 2003,
and numerous problems ensued.  (Compl. ¶ 53.)  The first
subcontractor Sears hired to perform the installation work,
Lester Biggs ("Mr. Biggs") of Biggs Heating and Air Conditioning
("Biggs"), began working at the Petinga residence before having

5

applied for the necessary permits for the work from Atlantic
City, falsely stating to the Petingas that he had obtained all of
the required permits.  (Sisselman Cert. Ex. C at 11.)  Mr. Biggs
and his employees worked on the installation for fourteen days
between February 25, 2003 and March 25, 2003.  (Sisselman Cert.
Ex. C. at 12.)  During this time, Plaintiffs allege, Mr. Biggs
and his employees filled the house with smoke and heater fumes,
left holes in exterior walls, and caused damage to the deck.
(Sisselman Cert. Ex. C. at 12-13.)  On March 17, 2003, Mr. Biggs
disclosed for the first time to the Petingas that he had not, in
fact, obtained the necessary permits for the work, and that he
would return in two days when he obtained the permits.  (Id. at
14.)  On March 19, 2003, Mr. Biggs applied for the electrical and
construction permits from the Atlantic City Division of
Construction ("DOC"), (id.), but the DOC rejected the electrical
and construction applications on March 28, 2003 and April 3,
2003, respectively, on account of the fact that they were
"incomplete and inadequate for review."  (Babb Cert. Ex. E at 6-
7.)  According to Plaintiffs, Mr. Biggs thereafter "disappeared
with out explanation."  (Pls.' Statement of Undisputed Material
Facts ("SUMF") ¶ 14.)

On April 25, 2003, Sears contacted Plaintiffs to inform them
that a second contractor, George Markey of Ocean Air Heating and
Air Conditioning ("OAHAC"), would be completing the installation

6

work.  (Sisselman Cert. Ex. C at 17.)  According to Plaintiffs, both Sears and OAHAC falsely represented to Plaintiffs on multiple occasions that OAHAC had re-submitted the permit applications to the DOC (when in fact it had not), while in fact the applications would not be submitted until June 18, 2003. (Id. at 17-19.)  In applying for a permit, OAHAC informed the DOC that it would be "reinstalling gas furnaces and ductwork in a more professional manner and bringing the job to code," as well as "making sure the air conditioning is working properly and efficiently." (Babb Cert. Ex. E at 19) (emphasis added).  The DOC issued the permits on July 25, 2003.  (Babb Cert. Ex. E at 20.)

OAHAC commenced the task of undoing Biggs' faulty work and reinstalling the system, inflicting considerable damage to the Petinga residence, as is set forth in the margin, in the process.[2]  Thereafter, OAHAC's installation failed six

---

[2]  Among the allegedly negligent acts committed by Sears's second construction contractor were: the failure to properly vent a hot water tank, causing carbon monoxide fumes to enter the residence, (Sisselman Cert. Ex. C at 20); the disturbance and dispersal of asbestos in the attic, (G. Petinga Dep. at 82-84); leaving a hole in the roof, (G. Petinga Decl. ¶ 3), and damage to the second-floor porch below the installed condensing units, which presently causes rainwater to leak into the residence, (G. Petinga Dep. At 55, 63-64); improperly punching a hole in the wall of the heating unit, which has caused the City to refuse to issue a Certificate of Occupancy for the first-floor apartment, (Babb Cert. Ex. A at 7; G. Petinga Dep. at 85); damaging a structural wall and a concrete floor, (Babb Cert. Ex. A at 7; G. Petinga Decl. ¶¶ 3, 11); ripping out plaster, lathe, and carpet, (G. Petinga Dep. at 55-56); ruining the acoustical tile ceiling

inspections by the DOC between August and December, 2003, (Babb Cert. Ex. E at 9-15, 23, 25-26), and, owing to a hole that OAHAC (allegedly) improperly punched in the wall of the heating unit, Atlantic City has to date refused to issue a certificate of occupancy for the first-floor apartment of the Petinga residence.[3] (Babb Cert. Ex. E at 12.)

Additionally, Plaintiffs allege, the heating and air conditioning systems that were installed do not function properly, due, first, to the fact that the heating system was not suited for a building the size the Petinga residence, and, second, to the fact that the air conditioning system was improperly installed. As to the former, Plaintiffs assert that the 100,000-BTU heating unit Mr. Vogel urged the Petingas to install is oversized for their space, (Sisselman Cert. Ex. C at 23); the impact of an oversized heating unit, according to Plaintiffs, is that the system cycles on and off too frequently, "never maintain[s] the desired space temperature properly," and

_____

and destroying florescent light fixtures, (id. at 90, 94, 104); ruining the tile floor in the kitchen, utility room, and heater room, (G. Petinga Decl. ¶ 3); and damaging ceilings, walls, and floors. Sears hired an asbestos removal specialist to address the asbestos problem created by OAHAC, (G. Petinga Dep. at 82-84), but, according to Plaintiffs, Sears has not addressed the remainder of these problems.

[3] On account of problems with OAHAC's work, the City also refused to issue a certificate of occupancy for the second-floor unit until November 2006. (Sisselman Cert. Ex. C at 25; Babb Cert. Ex. E at 9-15, 23, 25-26; A. Petinga Dep. at 21.)

results (perhaps unexpectedly) in "chronic inadequate heat in the first floor of their residence."  (Babb Cert. Ex. A at 4.)

With regard to the improper installation of the air conditioning system, Plaintiffs' evidence indicates that the subcontractors responsible for installing the air conditioning condensing units failed to comply with guidelines regarding the required clearances for the amount of free space around such units.  (Id.)  Because condensing units "require a certain amount of free space above and around their sides to allow proper airflow," the impact of the improper installation in the Petinga residence is that the units' cooling capacity has been compromised, the manufacturer's warranty has been voided, and the life expectancy of the equipment has been reduced.  (Id. at 4-5.)

**B.   Procedural History**

Plaintiffs filed this action against Sears on October 27, 2005, alleging that Sears violated New Jersey's Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 et seq. (Count I); committed fraud (Count II); breached the implied warranty of fitness of purpose (Count III); breached the parties' contract (Count IV); and was negligent and grossly negligent (Counts V and VI).[4]  Sears filed a Third-Party Complaint [Docket Item 10] against Mr. Biggs, Biggs, Mr. Markey, and OAHAC, and these Third-Party Defendants

---

[4]   The Court has jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332.

filed crossclaims against each other and the Petingas and counterclaims against Sears [Docket Items 13 and 19].  On February 18, 2009, Sears filed the motion for partial summary judgment presently under consideration [Docket Item 54], and Plaintiffs filed their cross-motion for partial summary judgment together with their opposition brief [Docket Item 59].

## III. DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

The standard by which the Court decides a summary judgment motion does not change when, as here, the parties file cross-motions.[5]  See In re Cooper, 542 F. Supp. 2d 382, 385-86

_____

[5]   There appears to be some confusion between the parties concerning Plaintiffs' cross-motion for partial summary judgment and Defendant's response thereto.  Pursuant to Magistrate Judge

10

(D.N.J. 2008).  When ruling on cross-motions for summary

judgment, the court must consider the motions independently,

Williams v. Philadelphia House Auth., 834 F. Supp. 794, 797 (E.D.

Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994), and view the

evidence on each motion in the light most favorable to the party

_____

Donio's January 5, 2009 Scheduling Order [Docket Item 52],
dispositive motions were to be filed by March 2, 2009.  Sears
filed its motion on February 18, 2009.  Plaintiffs first
requested an automatic extension of time to file their responsive
papers pursuant to Rule 7.1(d)(5), L. Civ. R., and then, pursuant
to Local Civil Rule 7.1(h), filed their cross-motion for partial
summary judgment together with their opposition papers.  Although
Plaintiffs' motion is clearly "related to the subject matter of
the original motion," L. Civ. R. 7.1(h), the electronic docketing
system set a separate return date for the cross-motion.
Defendant thereafter appears to have treated the cross-motion as
a separate, unrelated motion, filing a separate opposition brief
(to which Plaintiffs have filed a reply brief).  Defendant also
has suggested that Plaintiffs' cross-motion is untimely, as it
was filed after the dispositive motion deadline.
     Plaintiffs' cross-motion is not untimely.  As a court in
this District recently explained:

     Local Rule 7.1(h) permits a party to file a cross motion
     " . . . related to the subject matter of the original
     motion . . . together with that party's opposition papers
     . . . " See Davis v. Twp. of Paulsboro, 371 F. Supp. 2d
     611, 617 (D.N.J. 2005).  The cross motion ". . . may be
     noticed for disposition on the same date as the original
     motion, as long as the opposition papers were timely
     filed." L. Civ. R. 7.1(h) . . . . Under Rule 7.1(h), the
     cross motion was permitted to be filed on the date the
     opposition was due since the cross motion pertains to the
     same subject matter of the original motion.

Briglia v. Horizon Healthcare Services, Inc., No. 03-6033, 2007
WL 1959249, at *2 (D.N.J. July 3, 2007).  Because Plaintiffs'
cross-motion directly relates to the matters raised in
Defendant's motion for partial summary judgment, the cross-motion
was timely filed pursuant to L. Civ. R. 7.1(h), and the Court
will address the cross-motion in this Opinion.

11

opposing the motion.  <u>See</u> <u>Matsushita Elec. Indus. Co., Ltd.  v.</u>
<u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

   **B.   Analysis**

   Sears has moved for partial summary judgment on Plaintiffs'
CFA claim and their claim for emotional distress damages, and
Plaintiffs have cross-moved for partial summary judgment as to
aspects of their CFA claim.  For the reasons that follow, the
Court will grant in part and deny in part each party's cross-
motion for partial summary judgment.

        1.   <u>Consumer Fraud Act Claim</u>

   Plaintiffs allege that Defendant's conduct violated multiple
provisions of the CFA, including the Act's prohibition of "bait
and switch" advertising schemes, N.J.S.A. 56:8-2.2, and its
regulations prohibiting various unlawful practices related to the
sale of home improvement products and services.  <u>See</u> N.J.A.C.
13:45A-16.2.  Defendant argues that it is entitled to summary
judgment as to the entirety of Plaintiffs' CFA claim, while
Plaintiffs argue that they are entitled to summary judgment on
the issue of whether Sears violated specific regulations
contained in N.J.A.C. 13:45A-16.2.  As the Court now explains,
the Court will grant Defendant's motion for summary judgment as
to Plaintiffs' "bait and switch" claim, and will grant in part
Plaintiffs' motion for summary judgment on aspects of their
N.J.A.C. 13:45A-16.2 claim, and will deny the remainder of the

relief sought with respect to Plaintiffs' CFA claim.

      a.   <u>Overview</u>

The CFA provides in relevant part:

> Any person who suffers any ascertainable loss of moneys
> or property, real or personal, as a result of the use or
> employment by another person of any method, act, or
> practice declared unlawful under this act or the act
> hereby amended and supplemented may bring an action or
> assert a counterclaim therefor in any court of competent
> jurisdiction.  In any action under this section the court
> shall, in addition to any other appropriate legal or
> equitable relief, award threefold the damages sustained
> by any person in interest.  In all actions under this
> section, including those brought by the Attorney General,
> the court shall also award reasonable attorneys' fees,
> filing fees and reasonable costs of suit.

N.J.S.A. 56:8-19.  The practical question raised by Defendant's

challenge to the viability of Plaintiffs' CFA claim is thus

whether Plaintiffs are entitled to treble damages and attorneys'

fees for the damages they allegedly incurred as a result of any

of Defendant's conduct, or whether their potential recovery is

limited to the damages ordinarily available under the law of

contract and tort.

In order to prevail upon a CFA claim, a plaintiff must

establish "1) unlawful conduct by defendant; 2) an ascertainable

loss by plaintiff; and 3) a causal relationship between the

unlawful conduct and the ascertainable loss." <u>Bosland v. Warnock</u>

<u>Dodge, Inc.</u>, 197 N.J. 543, 557 (2009) (citations omitted).  As to

the first of these elements, the CFA proscribes three general

categories of "unlawful practices": "affirmative acts, knowing

omissions, and regulation violations.  The first two are found in the language of N.J.S.A. 56:8-2, and the third is based on regulations enacted under N.J.S.A. 56:8-4."[6]  <u>Cox v. Sears Roebuck & Co.</u>, 138 N.J. 2, 17 (1994).  With regard to the ascertainable loss element, the New Jersey Supreme Court has explained that "it means that plaintiff must suffer a definite, certain and measurable loss, rather than one that is merely theoretical."  <u>Bosland</u>, 197 N.J. at 558; <u>see also</u> <u>Thiedemann v. Mercedes-Benz USA, LLC</u>, 183 N.J. 234, 248 (2005) (evidence of loss "must be presented with some certainty demonstrating that it is capable of calculation, although it need not be demonstrated in all its particularity to avoid summary judgment").  The New Jersey Supreme Court has further described its "understanding of the ascertainable loss requirement generally in terms that make

---

[6]  N.J.A.C. 13:45A, which was enacted pursuant to N.J.S.A. 56:8-4, contains regulations making various "acts and practices involving the sale, attempted sale, advertisement or performance of home improvements" unlawful under the CFA.

As the New Jersey Supreme Court has recognized, "[t]o some extent, the proofs required [in order to prevail on a CFA claim] will vary depending upon the category into which any particular claim falls" – that is, whether the claims are based on a defendant's affirmative acts, knowing omissions, or regulatory violations. <u>Bosland</u>, 197 N.J. at 556.  For claims based upon knowing omissions, a plaintiff must also establish the defendant's intent.  <u>See</u> <u>Cox</u>, 138 N.J. at 18.  For claims based upon affirmative acts or regulatory violations, intent is not an element of the plaintiff's claim.  <u>See</u> <u>id.</u>  Plaintiffs' CFA claims are premised upon regulatory violations, for which intent is not a required element.  <u>See</u> <u>Roberts v. Cowgill</u>, 316 N.J. Super. 33, 37 (App. Div. 1998) (violation of CFA regulations is "a strict liability infraction").

it equivalent to any lost benefit of the bargain."  <u>Bosland</u>, 197
N.J. at 558 (internal quotations and citations omitted).
Finally, in interpreting the CFA, the Court must "be faithful to
the Act's broad remedial purposes . . . . [and] construe the
[Act] broadly, not in a crabbed fashion."  <u>Id.</u> at 555-56
(citations omitted).

b.   <u>"Bait and Switch" Claim</u>

Defendant argues, and the Court agrees, that it is entitled
to summary judgment as to Plaintiffs' claim that it engaged in an
unlawful "bait and switch" advertising scheme in violation of the
CFA.  Under N.J.S.A. 56:8-2.2, "[t]he advertisement of
merchandise as part of a plan or scheme not to sell the item or
service so advertised or not to sell the same at the advertised
price is an unlawful practice and a violation of the [CFA]."
N.J.S.A. 56:8-2.2.  Plaintiffs allege that Sears engaged in such
a scheme, in that it advertised the sale of central air
conditioning systems, but when Plaintiffs responded to the Sears
advertisement, Mr. Vogel persuaded them to replace their heating
system in addition to purchasing an air conditioning system.

Defendant argues that, even construing the evidence in the
light most favorable to Plaintiffs, no reasonable jury could
conclude from Mr. Vogel's efforts to convince Plaintiffs to
replace their heating system in addition to replacing their air
conditioning system that Sears engaged in an unlawful bait and

15

switch scheme in violation of the CFA.  Defendant draws the
Court's attention to the relevant provision of the CFA's
implementing regulations, which provides a non-exhaustive list of
examples of "[b]ait selling," and which is set forth in relevant
part in the margin.[7]  N.J.A.C. 13:45A-16.2(3).  According to

---

[7]  N.J.A.C. 13:45A-16.2(3) lists the following as examples
of unlawful "[b]ait selling":

    i.    Offer or represent specific products or materials
as being for sale, where the purpose or effect of
the offer or representation is not to sell as
represented but to bait or entice the buyer into
the purchase of other or higher priced substitute
products or materials;

    ii.   Disparage, degrade or otherwise discourage the
purchase of products or materials offered or
represented by the seller as being for sale to
induce the buyer to purchase other or higher priced
substitute products or materials;

    iii. Refuse to show, demonstrate or sell products or
materials as advertised, offered, or represented
as being for sale;

    iv.  Substitute products or materials for those
specified in the home improvement contract, or
otherwise represented or sold for use in the making
of home improvements by sample, illustration or
model, without the knowledge or consent of the
buyer;

    v.   Fail to have available a quantity of the advertised
product sufficient to meet reasonably anticipated
demands; or

    vi.  Misrepresent that certain products or materials are
unavailable or that there will be a long delay in
their manufacture, delivery, service or
installation in order to induce a buyer to purchase
other or higher priced substitute products or
materials from the seller.

Defendant, each of the examples of bait selling listed in
N.J.A.C. 13:45A-16.2(3) involves a seller's refusal to sell an
advertised product and the substitution of a higher priced or
different product at the point of sale; neither the statute nor
the regulations makes it unlawful to sell an additional product
or service as well as (as opposed to in lieu of) the advertised
product.  In this case, Defendant argues, Mr. Vogel did not, for
example, "[d]isparage, degrade or otherwise discourage the
purchase of [the advertised] products," N.J.A.C.
13:45A-16.2(3)(ii), in that Sears did, in fact, sell the
advertised air conditioning system in addition to the new heating
system.  Mr. Vogel's "[d]isparage[ment]" of the Petingas'
existing heating system, Sears maintains, is not evidence of an
unlawful bait and switch scheme, and cannot form the basis of a
N.J.S.A. 56:8-2.2 claim.  Id.

    Plaintiffs argue that a jury could reasonably conclude that
Sears engaged in an unlawful bait and switch advertising scheme
from the fact that "Sears' salesperson, Rich Vogel, upon
obtaining access to the Petingas' home for the invited purpose of
selling air conditioning, urged the Petingas to replace the
heating systems, even though the Petingas were completely
satisfied with their heating systems."  (Pls.' Opp'n Br. at 5.)

---

N.J.A.C. 13:45A-16.2(3).

Although Plaintiffs appear to concede that the conduct at issue
herein does not fall within any of the examples of bait selling
enumerated in N.J.A.C. 13:45A-16.2(3), Plaintiffs emphasize that
the regulations do not "limit[] any other practices which may be
unlawful under the Consumer Fraud Act," N.J.A.C. 13:45A-16.2, and
urge the Court to find that N.J.S.A. 56:8-2.2 makes it unlawful
to engage in "a plan or scheme to sell something other than what
was advertised," (Pls.' Opp'n Br. at 6), even if the "something
other" is sold in addition to, and not in lieu of, the advertised
product.

        The Court concludes that Defendant has the better argument
on this point.  While Plaintiffs are correct that the list of
bait-selling practices in N.J.A.C. 13:45A-16.2(3) is not
necessarily an exclusive catalogue of the bait-and-switch
practices proscribed by the CFA, the unambiguous language of
N.J.S.A. 56:8-2.2 makes plain that "a plan or scheme <u>not to sell</u>
the item or service so advertised or <u>not to sell</u> the same at the
advertised price" is an essential – indeed, <u>the</u> essential –
element of a N.J.S.A. 56:8-2.2 claim.  N.J.S.A. 56:8-2.2
(emphasis added).  <u>See</u> <u>Lozano v. Frank DeLuca Const.</u>, 178 N.J.
513, 522 (2004) (where "the statutory language is clear and
unambiguous, and susceptible to only one interpretation, courts
should apply the statute as written . . .").  As Defendant
argues, the plain language of the statute, as well as the

implementing regulations, make clear that N.J.S.A. 56:8-2.2 does not make it unlawful to advertise a product, to sell that product at the advertised price, and, at the point of sale, to encourage the consumer to purchase a different product in addition to the advertised product.  Put simply, under such circumstances, the "switch" component of a "bait-and-switch" scheme is absent.  In this case, Sears advertised air conditioning systems and sold the Petingas such a system, and did not, as such, violate N.J.S.A. 56:8-2.2.

It bears recognition that the conduct underlying Plaintiffs' N.J.S.A. 56:8-2.2 claim – namely, that Mr. Vogel allegedly "urged the Petingas to replace the heating systems, even though the Petingas were completely satisfied with their heating systems," (Pls.' Opp'n Br. at 5) – is potentially relevant to Plaintiffs' allegation that Sears violated a separate CFA regulation, N.J.A.C. 13:45A-16.2(9)(iii).  That provision, which makes it unlawful to "[m]isrepresent that the customer's present equipment, material, product, home or a part thereof is dangerous or defective, or in need of repair or replacement," id., is conceivably implicated by Mr. Vogel's statements regarding the Petingas' existing heating system, a matter which the Court addresses infra.  However, because Plaintiffs have failed to adduce evidence from which a jury could reasonably find that Sears "[d]isparage[d]," N.J.A.C. 13:45A-16.2(3)(ii), "[r]efuse[d]

19

to . . . sell," N.J.A.C. 13:45A-16.2(3)(iii), or otherwise "switched" the air conditioning system which it advertised (and which Plaintiffs purchased), N.J.A.C. 13:45A-16.2(3), the Court agrees with Defendant that Plaintiffs' N.J.S.A. 56:8-2.2 claim is unsustainable.  The Court will accordingly grant Defendant's motion for summary judgment as to Plaintiffs' CFA claim to the extent that the claim is based upon the CFA's proscription of bait-and-switch advertising schemes.

   c. <u>Claim for Violation of CFA Regulations</u>

   In addition to asserting a CFA claim based upon a bait-and-switch theory, Plaintiffs allege that Defendant violated a host of CFA regulations, and that such violations proximately caused Plaintiffs' losses.  With regard to this aspect of Plaintiffs' CFA claim, Defendant does not, at this stage, dispute that it violated at least some CFA regulations (and thus engaged in unlawful practices under the CFA, <u>see</u> <u>Cox</u>, 138 N.J. at 17), but it argues that none of the damages Plaintiffs allegedly suffered amounts to an "ascertainable loss" that can be causally traced to the violations, N.J.S.A. 56:8-19.  That is, Defendant argues that Plaintiffs' losses may be recoverable in contract and tort, but that Plaintiffs are not entitled to treble damages and attorneys' fees under the CFA.  Plaintiffs argue that the entirety of their damages amount to an ascertainable loss that was caused by Defendant's violation of the CFA's regulations.  The following

20

discussion reviews the CFA's ascertainable loss requirement before explaining why Defendant's motion for summary judgment as to Plaintiffs' claim based upon CFA regulatory violations will be denied.

> i.   <u>Ascertainable Loss and Causation Under the CFA</u>

As the Court explained, <u>supra</u>, in order to satisfy the CFA's ascertainable loss requirement, a plaintiff must establish that he or she suffered "a definite, certain and measurable loss," <u>Bosland</u>, 197 N.J. at 558, which is "capable of calculation," <u>Thiedemann</u>, 183 N.J. at 248, and which is not "merely theoretical." <u>Bosland</u>, 197 N.J. at 558.

> The certainty implicit in the concept of an "ascertainable" loss is that it is quantifiable or measurable. Moreover, it need not yet have been experienced as an out-of-pocket loss to the plaintiff. <u>See</u>, <u>e.g.</u>, <u>Cox</u>, <u>supra</u>, 138 N.J. at 22-23 (noting that to demonstrate "loss" victim need not have actually spent money to perform repairs to correct defendant's errors in performing kitchen renovation). An estimate of damages, calculated within a reasonable degree of certainty[,] will suffice to demonstrate an ascertainable loss.

<u>Thiedemann</u>, 183 N.J. at 248-49 (some internal quotations and citations omitted).

Hence, in <u>Cox</u>, in which the plaintiff's kitchen upgrade was shoddily executed as a result of the defendant's CFA regulatory violations, and in which "the testimony specifically addressed the cost of repairs," the New Jersey Supreme Court explained that the plaintiff's ascertainable loss "amounted to the cost of

repairing his kitchen." <u>Cox</u>, 138 N.J. at 22-23.[8]  By contrast,
in <u>Thiedemann</u>, in which the plaintiffs' automobiles had a defect
that was covered by the manufacturer's warranty, the New Jersey
Supreme Court explained, "[t]he defects that arise and are
addressed by warranty, at no cost to the consumer, do not provide
the predicate 'loss' that the CFA expressly requires for a
private claim under the CFA," <u>Thiedemann</u>, 183 N.J. at 251; as to
the plaintiffs' assertion that they were "inconvenienced by
problems caused by the defect[s]," the Court explained that
because "[a]ll repairs were performed by defendant under
warranty, at no cost to the [plaintiffs], and the loaner vehicles
were provided during periods when the . . . car was being
repaired," the plaintiffs could not establish that they had
suffered a quantifiable, and thus ascertainable, loss.  <u>Id.</u> at
251-52.

In addition to demonstrating that it suffered an
ascertainable loss, a private CFA plaintiff must establish "a
causal relationship between the [defendant's] unlawful conduct
and the ascertainable loss." <u>Bosland</u>, 197 N.J. at 557 (citation
omitted).  New Jersey courts have recognized that the CFA's
causation requirement is akin to the proximate cause element of a

---

[8]  <u>See</u> <u>also</u> <u>Furst v. Einstein Moomjy, Inc.</u>, 182 N.J. 1, 12-
13 (2004) (where evidence shows replacement cost of defective
product sold in violation of CFA regulations, replacement cost is
the ascertainable loss).

tort claim.  See, e.g., Zorba Contractors, Inc. v. Housing
Authority, City of Newark, 362 N.J. Super. 124, 142 (App. Div.
2003).  Although "[o]rdinarily, issues of proximate cause are
considered jury questions," Reyes v. Egner, 404 N.J. Super. 433,
467 (App. Div. 2009) (citation omitted), a plaintiff cannot
prevail if it has adduced no evidence from which a jury could
conclude that the defendant's CFA violation caused the
ascertainable loss.  See Josantos Const. v. Bohrer, 326 N.J.
Super. 42, 46 (App. Div. 1999).  Finally, while it is the
plaintiff's burden to establish that the defendant's unlawful
conduct proximately caused an ascertainable loss, "once a
plaintiff has established a significant relationship between the
defendant's unlawful practices and the plaintiff's ascertainable
losses[,] it becomes the defendant's responsibility to isolate
particular losses which do not have the required causal
connection." Roberts v. Cowgill, 316 N.J. Super. 33, 44 (App.
Div. 1998) (citing Cox, 138 N.J. at 21-24); see also Josantos,
326 N.J. Super. at 47.

### ii.  Analysis

Initially, the Court notes that in its motion, Sears does
not challenge Plaintiffs' capacity to establish the first element
of their CFA claim based upon alleged regulatory violations by
Sears – i.e., "unlawful conduct by [the] defendant." Bosland,
197 N.J. at 557 (citation omitted).  Indeed, Sears does not

23

appear to dispute the fact that it failed to "clearly and
accurately set forth in legible form and in understandable
language [in the parties' contract] . . . [t]he dates or time
period on or within which the work is to begin and be completed
by the seller," N.J.A.C. 13:45A-16.2(12)(iv), or that its
subcontractor failed to "[en]sure that all applicable state or
local building and construction permits ha[d] been issued as
required under state laws or local ordinances" before
"commenc[ing] work," N.J.A.C. 13:45A-16.2(10)(i), as the CFA's
regulations require.  Moreover, Plaintiffs' evidence is
sufficient, at the summary judgment stage, to support their
allegations that Sears "[m]isrepresent[ed] . . . that [the
heating system it sold was] . . . of sufficient size, capacity,
character or nature to do the job expected or represented,"
N.J.A.C. 13:45A-16.2(2); and "[m]isrepresent[ed] that
[Plaintiffs'] present equipment . . . [was] . . . in need of
repair or replacement," N.J.A.C. 13:45A-16.2(9)(iii); <u>see</u> (G.
Petinga Dep. at 39; Babb Cert. Ex. A at 4.)  Plaintiffs have thus
met their burden of adducing evidence showing that Defendant
engaged in unlawful conduct in violation of the CFA, a point not
contested (at least at this stage) by Sears.

"The next question, then, is whether [the Petingas] suffered
any 'ascertainable loss,' as contemplated by the Act."  <u>Cox</u>, 138
N.J. at 22.  Plaintiffs identify three categories of damages

which they allegedly sustained as a result of the above-listed regulatory violations: the cost of repairing the damage allegedly inflicted upon their property by Defendant's contractors, the lost rental income they sustained as a result of the City's refusal to issue a certificate of occupancy for the second-floor apartment on account of the code-noncompliant installation, and the cost of replacing the allegedly dysfunctional HVAC system.

The Court concludes that each of these categories constitutes an "ascertainable loss" within the meaning of the CFA. Each category consists of losses which are "quantifiable or measurable," and which are supported by "[a]n estimate of damages, calculated within a reasonable degree of certainty." Thiedemann, 183 N.J. at 248-49 (some internal quotations and citations omitted). First, with regard to the damage inflicted on Plaintiffs' property, see, e.g., Note 2, supra, Plaintiffs submit the detailed report of Christopher R. Pushman, P.E., which "specifically [quantifies] . . . the cost of repairs." Cox, 138 N.J. at 22. To the extent that these damages were caused by Sears, a point discussed infra, such precisely delineated costs of repair would constitute an ascertainable loss under the CFA. See id.; see also Thiedemann, 183 N.J. at 248-49. Second, the rental income for Plaintiffs' second-floor apartment, which was allegedly lost as a result of the City's refusal to reissue a certificate of occupancy due to the faulty HVAC system

25

installation work, (Babb Cert. Ex. E at 9-15, 23, 25-26; A. Petinga Decl. ¶ 10), is likewise "capable of calculation." Thiedemann, 183 N.J. at 248.  Plaintiffs' evidence, which indicates that the Petingas rented out the second-floor apartment for as long as they owned their home, and which shows the rental price Plaintiffs obtained before Plaintiffs lost the ability to rent the apartment and after the certificate of occupancy was reissued, (A. Petinga Decl. ¶¶ 7-10), is sufficient to show a loss which is "measurable." Bosland, 197 N.J. at 558.  Third, Plaintiffs have adduced sufficiently specific evidence concerning the replacement costs of the various components of their HVAC system for such costs to constitute an ascertainable loss, (Babb Cert. Ex. A), to the extent that they can be causally tied to Defendant's CFA violation.  See infra.  In summary, Plaintiffs' evidence of quantifiable damages sufficiently demonstrates "ascertainable loss," and thus satisfies the second element of their CFA claim for purposes of Defendant's motion for partial summary judgment.[9] Bosland, 197 N.J. at 557.

---

[9]  Defendant's reliance upon Thiedemann in suggesting that Plaintiffs have failed to adduce evidence of ascertainable loss is misplaced.  In Thiedemann, the New Jersey Supreme Court held that because the defects in the plaintiffs' automobiles were covered by, and repaired pursuant to, the vehicles' warranties, the plaintiffs had not suffered an ascertainable loss as a result of the defects.  See Thiedemann, 183 N.J. at 251-52.  The Court explained that Plaintiffs' complaints of having been inconvenienced were insufficiently quantifiable to qualify as ascertainable losses within the meaning of the CFA.  Id.  In this case, there is no suggestion from the evidence that the damages

Finally, the Court disagrees with Sears that summary judgment should be entered due to the absence of "a causal relationship between the unlawful conduct and the ascertainable loss." Id. Under New Jersey law, "questions of . . . causation are within the jury's province in all but the most exceptional situations." Highlands Ins. Co. v. Hobbs Group, LLC., 373 F.3d 347, 356 (3d Cir. 2004) (citing cases); see also Reyes, 404 N.J. Super. at 467. The implications of this principle in the context of the CFA are illustrated by the contrast between the following two cases. In Cox, where the defendant failed to make "sure that all applicable state or local building and construction permits ha[d] been issued as required under state laws or local ordinances" before "commenc[ing] work," N.J.A.C. 13:45A-16.2(10)(i), and where the resultant work was faulty, the New Jersey Supreme Court held that a jury could find a causal link between the violation and the injury:

> For instance, the jury could have concluded that although several permits were required, none was obtained for plaintiffs renovations. Although no statute or regulation requires a home-repair contractor to obtain all permits for an owner, N.J.A.C. 13:45A-16.2(a) 10i does provide that no contractor may begin work until he or she is sure that all applicable permits have been

---

reviewed above were covered by a similar warranty or otherwise cured by Sears such that Plaintiffs' losses could be said to amount merely to having been inconvenienced. Indeed, Plaintiffs' evidence suggests precisely the opposite, in that the faulty installation of the HVAC system has, in fact, "[v]oid[ed] the manufacturer's warrant[y]" for at least some of Plaintiffs' equipment. (Babb Cert. Ex. A at 5.)

> issued.  Sears, by beginning work without checking for
> permits,  disregarded  the  regulation  and  therefore
> violated the Act . . . .
>
> Had all applicable permits been obtained before Sears
> began work, the issued permits would have triggered
> periodic inspections of the renovations.  An inspector
> would have detected any substandard electrical wiring or
> cabinet work and would not have permitted the work to
> progress or have issued the required certificates until
> Sears corrected the deficiencies.

Cox, 138 N.J. at 19-20, 22.

By contrast, in Josantos, in which "[t]he only violation of

the Consumer Fraud Act was the premature submission of the

Certification of Completion to the [customer]," the Appellate

Division held that no jury could find a causal relationship

between such a violation and the defects in the construction work

that later emerged.  326 N.J. Super. at 46.  The court explained:

> We fail to see a causal connection between that technical
> violation of the Consumer Fraud Act and the subsequent
> discovery of additional defects in the work.  The
> fortuitous occurrence that the signing of the Certificate
> of Completion preceded the discovery of the deficiencies
> does not supply the causal connection necessary to
> establish an "ascertainable loss."  The defects in the
> work would have been discovered in the same manner if the
> Certificate of Completion had not been presented
> prematurely or indeed if it had not been presented at
> all.

Id. (emphasis added).

The Court cannot agree with Defendant's argument that no

reasonable jury could find a causal link between the CFA

violations summarized above and the losses Plaintiffs incurred;

that is, this case is closer to Cox than to Josantos.  With

28

regard to the allegedly faulty installation work initially performed by Biggs and the damage OAHAC inflicted upon the Petinga residence in the course of undoing Biggs' allegedly flawed work,[10] the Court agrees with Plaintiffs that a jury could reasonably find a causal relationship between Biggs' failure to "[en]sure that all applicable state or local building and construction permits ha[d] been issued as required under state laws or local ordinances" before "commenc[ing] work," N.J.A.C. 13:45A-16.2(10)(i), and the losses incurred in responding to the code-noncompliant and otherwise flawed work that ensued. According to Plaintiffs' evidence, Biggs worked for fourteen days without having first sought the requisite permits, and when Mr. Biggs finally applied for a permit, the application was rejected for being "inadequate for review."  (Babb Cert. Ex. E at 6-7.) Biggs' code-noncompliant work thereafter had to be redone, (Babb Cert. Ex. E at 16), and, in endeavoring to redress Biggs' faulty installation, Sears' subsequent contractors inflicted considerable damage upon the property.  See Note 2, supra.  As in Cox, a jury could reasonably find that, had Biggs obtained all necessary permits before commencing work, the subsequent work aimed at correcting Biggs' code-noncompliant installation, and

---

[10]  On this point, it bears recognition that in applying for a permit from the DOC, Sears' second contractor, OAHAC, characterized the project as "reinstalling gas furnaces and ductwork in a more professional manner and bringing the job to code."  (Babb Cert. Ex. E at 19.)

the consequent damage to Plaintiffs' property, would not have been necessary.[11] <u>Cox</u>, 138 N.J. at 19-20, 22. Put differently, the damage to Plaintiffs' property that transpired in the process of undoing Biggs' faulty installation was not such a "fortuitous occurrence," so manifestly unrelated to the underlying CFA violation, <u>Josantos</u>, 326 N.J. Super. at 46, that the issue of causation can be decided in Defendant's favor as a matter of law. See <u>Highlands</u>, 373 F.3d at 356.

Likewise, the second category of "ascertainable loss" in this case – Plaintiffs' lost rental income – bears a sufficient causal relationship to the CFA violations reviewed above that the issue of causation should be submitted to the jury. <u>Id.</u> Specifically, Plaintiffs' evidence indicates that the City

---

[11]   Defendant's effort to distinguish <u>Cox</u> is unpersuasive. According to Sears, while the defendant in <u>Cox</u> violated the CFA by <u>never</u> applying for the relevant permits, here, work permits were eventually obtained.  Sears suggests that this distinction renders <u>Cox</u> inapposite because in this case, unlike <u>Cox</u>, "close supervision of the job by the Construction Division" eventually took place, severing the causal connection between the CFA violation and the losses that ensued.  (Def.'s Br. at 14.) Defendant's argument overlooks the chronology of the events underlying this dispute.  While it is true that permits were ultimately obtained and inspections performed, such actions were not taken until <u>after</u> Biggs spent fourteen days installing a code-noncompliant HVAC system.  That is, by the time the Construction Division was involved, much of the damage had already been done.  Indeed, while the installation work was ultimately subject to inspection by the Construction Division, it consistently <u>failed</u> the inspections, (Babb Cert. Ex. E at 9-15, 23, 25-26), a fact upon which the jury could rely in drawing a causal connection between the initial CFA violation and the subsequent losses.

refused to issue a certificate of occupancy for Plaintiffs'
second-floor apartment on account of installation work that
failed to comply with the City's building code.  (Sisselman Cert.
Ex. C at 25; Babb Cert. Ex. E at 9-15, 23, 25-26.)  The evidence
likewise indicates that at the time of contracting, Sears was
aware that Plaintiffs had historically rented out their upstairs
apartment, (A. Petinga Dep. at 12, 15), that Plaintiffs had a
prospective tenant for the second-floor apartment who could not
move in "because the repairs and installation were not
completed," (A. Petinga Decl. ¶ 9), that Sears was aware that
Plaintiffs were unable to rent the apartment to the prospective
tenant, (Sisselman Cert. Ex. C at 17), and that Plaintiffs were
able to rent the apartment two days after the certificate of
occupancy for that apartment was finally issued in November 2006.
(A. Petinga Dep. at 21.)  A jury could find from this evidence
that Plaintiffs' lost rental income is causally tied to Biggs'
initial code-noncompliant installation work, and that, "[h]ad all
applicable permits been obtained <u>before</u> Sears began [this]
work[,] . . . [an] inspector . . . would not have permitted the
work to progress or have issued the required certificates until
Sears corrected the deficiencies." <u>Cox</u>, 138 N.J. at 22 (emphasis
added).

Finally, a jury could find that the loss Plaintiffs incurred
from receiving an allegedly dysfunctional HVAC system bears a

causal relationship to Defendant's alleged CFA violations.  In
particular, a jury could reasonably conclude from Plaintiffs'
evidence that Mr. Vogel "[m]isrepresent[ed] . . . that [the
heating system Sears sold was] . . . of sufficient size,
capacity, character or nature to do the job expected or
represented," N.J.A.C. 13:45A-16.2(2), in that Plaintiffs' expert
witness, Mr. Pushman, indicates that the 100,000-BTU unit Mr.
Vogel recommended was substantially oversized for Plaintiffs'
space and is incapable of "maintain[ing] the desired space
temperature properly."  (Babb Cert. Ex. A at 4.)  The alleged
incapacity of the heating system to perform correctly in the
Petingas' space bears a causal relationship to Mr. Vogel's
alleged misrepresentation concerning its appropriateness for the
residence, indicating that summary judgment on the matter of
causation is unwarranted.  Moreover, Plaintiffs' evidence
indicates that the air conditioning system's poor cooling
capacity stems from the fact that the condensing units were
installed too closely together, compromising each unit's
functional capacity.  (Babb Cert. Ex. A at 5.)  As the Court
explained, <u>supra</u>, the jury could draw a causal link between the
failure to obtain permits prior to commencing installation and
the allegedly negligent installation that ensued.  <u>See</u> <u>Cox</u>, 138
N.J. at 19-20, 22.

In summary, the Court finds that issues of fact exist as to

32

whether Defendant's CFA violations caused Plaintiffs' "ascertainable loss[es]."  N.J.S.A. 56:8-19.  The Court will accordingly deny Defendant's motion for partial summary judgment as to Plaintiffs' CFA claim.

        d.  <u>Plaintiffs' Cross-Motion for Partial Summary Judgment</u>

Plaintiffs move for partial summary judgment on their CFA claim, arguing that the undisputed facts demonstrate that Sears failed to "clearly and accurately set forth in legible form and in understandable language [in the parties' contract] . . . [t]he dates or time period on or within which the work is to begin and be completed by the seller," N.J.A.C. 13:45A-16.2(12)(iv), and that its subcontractor failed to make "sure that all applicable state or local building and construction permits ha[d] been issued as required under state laws or local ordinances" before "commenc[ing] work," N.J.A.C. 13:45A-16.2(10)(i), as the CFA's regulations require.  Plaintiffs assert that "[t]he resulting ascertainable loss at a minimum is the loss of rent on the second floor apartment . . . [and] the cost of repairs and corrections." (Pls.' Opp'n Br. at 23-24.)  Defendant argues that the issues of ascertainable loss and causation should be decided in its favor (an argument the Court rejected, <u>supra</u>), or, at minimum, that such issues present jury questions.

The Court will grant in part Plaintiffs' cross-motion for partial summary judgment.  The evidence demonstrates that Sears

did not include in its contract with the Petingas "[t]he dates or time period on or within which the work is to begin and be completed by the seller."  N.J.A.C. 13:45A-16.2(12)(iv); <u>see</u> (Sisselman Cert. Ex. B.)  The evidence likewise demonstrates that Biggs commenced work in February 2003, (Sisselman Cert. Ex. C at 11), but that permits for such work were not even requested (much less issued) until the following month, contrary to the requirements of N.J.A.C. 13:45A-16.2(10)(i).  (Sisselman Cert. Ex. E.)  Sears has not adduced evidence to suggest that a dispute exists as to these facts; indeed, it is Sears' evidence that supports Plaintiffs' factual claims.  As to the issue of whether Sears violated N.J.A.C. 13:45A-16.2(10)(i) and 13:45A-16.2(12)(iv), then, the Court finds no dispute of fact and will enter partial summary judgment in Plaintiffs' favor.

However, as the Court explained in detail, <u>supra</u>, "questions of . . . causation are within the jury's province."  <u>Highlands</u>, 373 F.3d at 356.  The Court is clearly unable to determine whether and to what extent any of Plaintiffs' losses were caused by the regulatory violations the facts herein establish that Sears committed; that is, Plaintiffs have not proven, as a matter of law, the causal connection between the regulatory violations referenced above and the losses they suffered.  The Court will thus grant Plaintiffs' motion for partial summary judgment as to the narrow issue of whether Sears violated N.J.A.C.

34

13:45A-16.2(10)(i) and 13:45A-16.2(12)(iv), but deny the
remainder of the relief sought in Plaintiffs' cross-motion.[12]

      2.   <u>Emotional Distress Damages for Tort Claims</u>

Finally, the Court addresses Defendant's motion for summary
judgment as to Plaintiffs' entitlement to emotional distress
damages for their negligence claims.  According to Sears,
Plaintiffs' case is "essentially a breach of contract action for
property damage," (Def.'s Br. at 22), making Plaintiffs' tort
claims, in which Plaintiffs seek damages for emotional distress,
unsustainable.  To the extent Plaintiffs' negligence claims can
be characterized as a claim for negligent infliction of emotional
distress, Sears maintains, summary judgment is warranted on
account of Plaintiffs' failure to adduce evidence of having

---

[12]  Contrary to Plaintiffs' suggestion, the fact that
Defendant violated the CFA regulations does not, in itself,
entitle Plaintiffs to an award of attorneys' fees.  As the
Appellate Division recently made explicit, a showing at trial of
ascertainable loss proximately caused by the violation must be
established before the right to an award of attorney fees can be
considered:

> [I]n a Consumer Fraud Act case where the defendant
> obtains a motion for involuntary dismissal at the end of
> the plaintiff's case for failure to prove an
> ascertainable loss, and the defendant is not required to
> present its defense to the plaintiff's claim, and the
> fact-finder, whether judge or jury is not called upon to
> decide whether an ascertainable loss has been proved,
> plaintiff is not entitled to recover attorneys' fees.

<u>Pron v. Carlton Pools, Inc.</u>, 373 N.J. Super. 103, 113 (App. Div.
2004); <u>see</u> <u>also</u> <u>Weinberg v. Sprint Corp.</u>, 173 N.J. 233, 253-54
(2002).

experienced severe emotional distress.  See Decker v. Princeton Packet, Inc., 116 N.J. 418, 429 (1989).

In opposing Defendant's motion for summary judgment as to their claim for emotional distress damages, Plaintiffs insist that they are not asserting a claim for negligent infliction of emotional distress, arguing instead that "Sears' prolonged and inexcusable interference with the Petingas' peaceful enjoyment of their dwelling place entitles plaintiffs to the full panoply of tort remedies for the resulting emotional distress."  (Pls.' Opp'n Br. at 18.)  Plaintiffs identify no relevant authority suggesting that emotional distress damages may be awarded for the tort claims they assert (in the absence of a properly pleaded claim for negligent infliction of emotional distress), instead citing a series of inapposite cases unrelated to the claims at issue herein.[13]

The Court will grant Defendant's motion for summary judgment as to Plaintiffs' entitlement to emotional distress damages for

_____

[13]  E.g., Rexon v. Board of Adjustment of Borough of Haddonfield, 10 N.J. 1, 10 (1952) (subjecting denial of zoning variance to arbitrary and capricious review); Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72 (1980) (holding "that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy"); Pickett v. Lloyd's, 131 N.J. 457, 475 (1993) (holding that a cause of action exists for an insured whose insurer refused in bad faith to pay claims, and specifically limiting the damages available under such a cause of action to economic losses in the absence of an independent claim for negligent infliction of emotional distress).

their tort claims.  As a starting point, the Court notes that
under New Jersey law, "a tort remedy does not arise from a
contractual relationship unless the breaching party owes an
independent duty imposed by law."  Saltiel v. GSI Consultants,
Inc., 170 N.J. 297, 315 (2002).  "If there is no duty owed to a
plaintiff independent of what the defendant owes plaintiff under
a contract, a plaintiff may not maintain a tort claim (as a
necessary element of the tort claim is absent)."  South Broward
Hosp. Dist. v. MedQuist Inc., 516 F. Supp. 2d 370, 396 (D.N.J.
2007).

> Nonetheless, courts have acknowledged that "[t]he
> boundary line between tort and contract actions is not
> capable of clear demarcation."  New Mea Constr. Corp. v.
> Harper, 497 A.2d 534 (N.J. Super. Ct. App. Div. 1985) .
> . . . .  New Jersey law recognizes a general legal
> obligation to avoid damaging another person's property.
> See Black v. Borough of Atl. Highlands, 623 A.2d 257, 262
> (N.J. Super. Ct. App. Div. 1993) (explaining that all
> members of society are required "to exercise due care to
> avoid injury to another's person or property" (quoting
> Rosenblum v. Adler, 641 A.2d 138, 144 (1983))).
> Defendant undoubtedly owes Plaintiff[s] this duty,
> independent and irrespective of their contractual
> relationship.

McRory v. Zappolo, No. 06-3251, 2007 WL 3227177, at *4 (D.N.J.
Oct. 29, 2007).

That Sears owed Plaintiffs a duty "to exercise due care to
avoid injury to . . . [Plaintiffs'] property," id. (citations
omitted), however, does not mean that Plaintiffs are entitled to
recover nonpecuniary damages if Sears violated this duty.  This
is because, under well-established principles of tort law, while

a plaintiff may assert a cause of action for negligent or
intentional infliction of emotional distress, the compensatory
damages that are available for a cause of action based on the
harm caused to a plaintiff's personal property do not include
nonpecuniary damages for emotional distress:

> The principal element of damages in actions for battery,
> assault or false imprisonment, as well as in actions for
> defamation, malicious prosecution and alienation of
> affections, is frequently the disagreeable emotion
> experienced by the plaintiff. <u>In other cases, protection
> against disagreeable emotions not involving bodily pain
> is ordinarily given only in an action for infringement of
> some other interest.</u>  Thus one who insults or annoys
> another, thereby causing a third person to suffer fright
> or physical discomfort, is ordinarily not subject to
> liability to the third person unless bodily harm results.
> <u>Whether there can be an action merely for harm to the
> feelings presents a question of the existence of the
> cause of action and is not a problem of the amount of
> damages.</u>

Restatement (Second) of Torts § 905 cmt. c (1977) (emphasis
added); <u>see also</u> <u>Decker v. Princeton Packet, Inc.</u>, 116 N.J. 418,
429 (1989) (describing elements of a cause of action for
negligent infliction of emotional distress).  In other words, in
cases "not involving bodily pain," a plaintiff cannot recover for
emotional distress damages without asserting a separate claim for
negligent or intentional infliction of emotional distress, or one
of the six above-listed causes of action not at issue herein.
<u>See</u> Restatement (Second) of Torts § 905 cmt. c.

Plaintiffs thus cannot recover emotional distress damages in
this case in the absence of a claim for negligent or intentional

infliction of emotional distress.  As the Court recognized, <u>supra</u>, Plaintiffs have disclaimed any intent to assert a claim for negligent infliction of emotional distress, expressly asserting their right as the parties who filed this lawsuit "to decide what law [they] will rely on."  <u>The Fair v. Kohler Die & Specialty Co.,</u> 228 U.S. 22, 25 (1913).

Even if the Court were to ignore this disclaimer, however, Plaintiffs have failed to state a claim for either intentional or negligent infliction of emotional distress.

> To establish a claim for intentional emotional distress, [Plaintiffs] must prove (1) conduct by Defendants so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community, (2) an intentional act, committed with the intent to produce emotional distress or in deliberate disregard of a high degree of probability that emotional distress will follow, (3) causation and resulting emotional distress that is so severe that no reasonable person could be expected to endure it.

<u>Green v. City of Paterson</u>, 971 F. Supp. 891, 911 (D.N.J. 1997) (internal quotations and citations omitted).  Intentionally outrageous conduct is at the heart of such a claim, and even "gross negligence" will not rise to the level of sufficiently outrageous conduct.  <u>Eyrich for Eyrich v. Dam</u>, 193 N.J. Super. 244, 260 (App. Div. 1984).  Plaintiffs' own pleadings make plain that their claims are based, at most, on Defendant's alleged "gross negligence," (Compl. Count VI) (capitalization omitted), foreclosing any possibility of recovery based upon an intentional

infliction of emotional distress theory.

Plaintiffs likewise cannot prevail on a negligent infliction of emotional distress theory.  Liability for negligent infliction of emotional distress "depend[s] on the defendant's foreseeing <u>fright or shock severe enough to cause substantial injury</u> in a person normally constituted."  <u>Decker</u>, 116 N.J. at 429 (citation omitted, emphasis added).  In light of New Jersey courts' "concern over the genuineness of an injury consisting of emotional distress without consequent physical injury," the New Jersey Supreme Court has limited the scope of the negligent infliction of emotional distress tort to specific categories of cases.  <u>Id.</u>  These categories include situations in which the emotional injury is caused by a "physical impact," <u>id.</u> at 430 (citing <u>Eyrich</u>, 193 N.J. Super. at 252), cases in which "the emotional distress results in physical injury," <u>id.</u> (citing <u>Falzone v. Busch</u>, 45 N.J. 559, 569 (1965)), and, more recently, cases of bystander liability, in which the "plaintiff perceives an injury to another at the scene of the accident, the plaintiff and the victim are members of the same family, and the emotional distress is severe."  <u>Id.</u> (citing <u>Portee v. Jaffee</u>, 84 N.J. 88, 93 (1980)).

Plaintiffs have cited no authority to suggest that the New Jersey Supreme Court would extend the carefully circumscribed bounds of this tort beyond the "fright or shock" cases described

40

above, and the Court is aware of none.  Id. at 429 (citation
omitted).  Because Plaintiffs have failed to state a claim for
which emotional distress damages may be awarded, the Court will
grant Defendant's motion for summary judgment as to Plaintiffs'
entitlement to emotional distress damages for their negligence
claims.

**IV.  CONCLUSION**

     For the reasons explained above, the Court will grant
Defendant's motion for summary judgment as to Plaintiffs' CFA
claim based on a "bait and switch" advertising scheme and will
likewise grant the motion for summary judgment as to Plaintiffs'
claim for emotional distress damages.  Plaintiffs' cross-motion
for partial summary judgment will be granted as to the limited
issue of whether Defendant violated N.J.A.C. 13:45A-16.2(10)(i)
and 13:45A-16.2(12)(iv).  The remainder of the relief sought in
the parties' cross-motions will be denied.  The accompanying
Order is entered.


**June 9, 2009**               **s/ Jerome B. Simandle**
Date                      JEROME B. SIMANDLE
                         United States District Judge